# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| E. RAYMOND MOCK, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 214-113 |
| | * | |
| CENTRAL MUTUAL INSURANCE | * | |
| COMPANY, | * | |
| | * | |
| Defendant. | * | |

## ORDER

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (dkt. no. 23) and Motion to Strike (dkt. no. 39), as well as Defendant's Motion for Summary Judgment (dkt. no. 28) and Motion to Strike (dkt. no. 57).[1] For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment (dkt. no. 23) is **DENIED**, and his Motion to Strike (dkt. no. 39) is **GRANTED in part** and **DENIED in part**. Additionally, Defendant's Motion for Summary Judgment (dkt. no.

---

[1]  Appearing at docket entry number 39 in this case is a document entitled, "Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment and Motion to Strike." Dkt. No. 39. However, the docket sheet does not reflect that this entry contains a pending Motion. Accordingly, the Clerk of Court is **DIRECTED** to update docket entry number 39 to reflect that it is a Motion requiring a ruling of the Court, and to enter the Court's ruling as set forth herein.

28) is **GRANTED in part** and **DENIED in part**, and its Motion to Strike (dkt. no. 57) is **DENIED**.

BACKGROUND

Plaintiff owns a building in Waycross, Georgia (the "Property"), which he leases to commercial tenants. Dkt. No. 28-1, ¶¶ 1-2; Dkt. No. 39-1, ¶¶ 1-2. From June 1, 2013, to June 1, 2014, Plaintiff was the named insured on an insurance policy issued by Defendant, Policy No. CLP 8886164. Dkt. No. 23-2, ¶ 1; Dkt. No. 34, ¶ 1; see also Dkt. No. 23-3 ("Policy"). The Policy insured Plaintiff's Property against specified loss or damage during the policy period. Dkt. No. 23-2, ¶ 2; Dkt. No. 34, ¶ 2; see also Policy, pp. 13, 23.

**I.  Repairs to the Property**

At all relevant times, the building on Plaintiff's Property has been covered by a foam roof. Dkt. No. 28-1, ¶ 1; Dkt. No. 39-1, ¶ 1. Around June or July of 2013, the tenant on the Property notified Plaintiff that there were several water leaks in the roof due to its deterioration, and that the leaks were leaving some brown stains on the ceiling tiles. Dkt. No. 28-1, ¶ 2; Dkt. No. 39-1, ¶ 2.[2] Shortly thereafter, Plaintiff hired David Bess ("Bess") to inspect the Property and to determine

---

[2]  To the extent that Plaintiff's statements of fact (dkt. nos. 23-2, 39-1) discuss matters not addressed in those of Defendant (dkt. nos. 28-1, 34), those facts are included here, because Defendant has not objected to them. See Dkt. Nos. 34, 42.

what action needed to be taken with regard to the roof.  Dkt. No. 28-1, ¶ 3; Dkt. No. 39-1, ¶ 3.

Bess, an uninsured contractor, had previously worked on the roof of Plaintiff's personal home, as well as several of his rental homes, and Plaintiff had been satisfied with his performance.  See Dkt. No. 28-1, ¶ 4; Dkt. No. 39-1, ¶ 4.  Over the course of his career, Bess had repaired between three to four hundred roofs, thirty of which were commercial roofs, though none of his work on commercial roofs took place within the fifteen years prior to his inspection of Plaintiff's Property.  Dkt. No. 28-1, ¶ 4; Dkt. No. 39-1, ¶ 4.

After inspecting the Property, Bess, to his recollection, consulted with Joel Mendez ("Mendez"), a roofer.  Dkt. No. 28-1, ¶¶ 5-6; Dkt. No. 39-1, ¶ 5.  Mendez had installed numerous roofs, including metal roofs, and assisted with the roof work on Plaintiff's house, but he had not done the roofing for any commercial properties.  See Dkt. No. 28-1, ¶ 6; Dkt. No. 39-1, ¶ 6.  Together, Bess and Mendez (collectively, the "Roofers") determined that a metal roof needed to be installed on top of the Property's existing foam roof, and Plaintiff approved of this plan.  See Dkt. No. 28-1, ¶ 5; Dkt. No. 39-1, ¶ 5.

The process of adding the metal roof was to take place as follows: the Roofers would cut trenches in the existing foam roof, use wet cement to seal any nails (such that water would

not get in through the nail holes in the event of rain), place wooden planks in the trenches, attach the planks to the wood truss system under the foam roof, install the metal roofing, and then apply flashing and waterproofing. See Dkt. No. 28-1, ¶ 7; Dkt. No 39-1, ¶ 7. As of the evening of August 22, 2013, the Roofers had cut trenches in much of the foam roof, but the parties dispute whether they had begun installing the metal roof. Dkt. No. 28-1, ¶ 8; Dkt. No. 39-1, ¶ 8.[3]

## II.  Rain Incident

According to Plaintiff, Bess called him on the evening of August 22, 2013, and notified him that a storm was approaching. Dkt. No. 28-10 ("Pl.'s Dep."), 51:14-23. Plaintiff states that he instructed Bess, "[G]o to Lowe's and buy some tarps and cover that roof good before you leave," and that Bess, as directed, "bought $500 worth of tarps, and he covered it." Id. at 51:23-52:1. Bess confirms these events and adds that it took ten workers and "[h]undreds" of nails and screws to fasten the large tarps to the building. Dkt. No. 28-9 ("Bess Dep."), 26:11-28:1, 29:6-7, 29:20-30:3. Mendez states that the workers "cover[ed] the whole building" with the tarps. Dkt. No. 29-1 ("Mendez Dep."), 29:4.

---

[3]  Defendant contends that none of the metal roof had been installed, dkt. no. 28-1, ¶ 8, while Plaintiff maintains that between 75% and 80% of the roof was in place as of this date, dkt. no. 39-1, ¶ 8.

AO 72A
(Rev. 8/82)

Sometime between the early evening of August 22, 2013, and the early morning of August 23, 2013, it began to rain. Dkt. No. 28-1, ¶ 9; Dkt. No. 39-1, ¶ 9. On the morning of August 22, 2013, Plaintiff received a phone call from the tenant on the Property informing him that there was water inside of the building. Dkt. No. 28-1, ¶ 10; Dkt. No. 39-1, ¶ 10. Plaintiff went to the Property to speak with the tenant and found that the tenant had contacted ServPro Intellectual Property, Inc. ("ServPro"), a water remediation company, who had already arrived at the Property with equipment. See Dkt. No. 28-1, ¶ 15; Dkt. No. 39-1, ¶ 15; see also Dkt. No. 28-6 (ServPro Authorization). Plaintiff agreed to allow ServPro perform the remediation work and signed an authorization form to this effect. Dkt. No. 28-1, ¶ 15; Dkt. No. 39-1, ¶ 15; see also Dkt. No. 28-6. ServPro eventually sent Plaintiff a bill for its services in the amount of $89,000, which Plaintiff settled with ServPro for $85,000. Dkt. No. 23-2, ¶ 6; Dkt. No. 34, ¶ 6.

According to the Roofers, the rain continued for a period of at least two days. Bess Dep., 30:4-5; Mendez Dep., 27:17-18. Bess states that he checked the tarps on the roof during this time, finding that they were "okay" and "fine" after the first day of rain, and that they were still in place but "had . . . collapsed" from "[t]oo much rainwater on them" after the second day. Bess Dep., 31:15-32:9. Mendez testifies that he, too,

checked the tarps following the rain, finding that none had blown off and all were "still secured or fastened" to the roof. Mendez Dep., 31:17-20, 34:5-10. Mendez notes that the tarps "draped in" with "a bunch of water," and that water likely got into the trenches, but that he never lifted the tarps to examine the trenches. Id. at 31:10-14, 32:10-18, 34:25-35:5.

While uncertain as to where, exactly, the rainwater entered the building, Plaintiff testifies that he believes it came in somewhere around an air conditioning unit that sits on top of the roof. Pl.'s Dep., 58:21-59:6. Bess, on the other hand, states that he thinks the water drained through the trenches, though he admits that he only saw standing water on the tarps and never saw any water entering the building through a particular trench. Bess Dep., 39:22-24, 40:24-41:15. As for Mendez, he attests that he does not "have any clue" where the water entered the building, whether water got into the trenches, or whether water seeped from those trenches through the foam roof. Mendez Dep., 32:2-8, 32:19-21, 35:3-5.

Sometime thereafter, Plaintiff hired a different roofing contractor, Lifetime Roofing, to replace the existing roof with a rubberized roof. Dkt. No. 28-1, ¶ 16; Dkt. No. 39-1, ¶ 16.

## III. The Policy

These events took place during the policy period of Plaintiff's insurance agreement with Defendant. See Dkt. No.

23-2, ¶¶ 1-2; Dkt. No. 34, ¶¶ 1-2; see also Policy, p. 13.  The

Policy states that "[Defendant] will pay for direct physical

loss [of or damage] to Covered Property at the premises . . .

caused by or resulting from any Covered Cause of Loss."  Dkt.

No. 28-1, ¶ 24; Dkt. No. 39-1, ¶ 24; see also Policy, p. 23.

The Policy, in turn, defines "Covered Causes of Loss" as "Risks

Of Direct Physical Loss unless the loss is: 1. Excluded in

Section B., Exclusions; or 2. Limited in Section C.,

Limitations; that follow."  Dkt. 28-1, ¶ 24; Dkt. No. 39-1, ¶

24; see also Policy, p. 48.

In the "Exclusions" section, the Policy includes the

following provisions:

> 3.   [Defendant] will not pay for loss or damage caused
> by or resulting from any of the following[] 3a.
> through 3.c.  But if an excluded cause of loss that is
> listed in 3.a. through 3.c. results in a Covered Cause
> of Loss, [Defendant] will pay for the loss or damage
> caused by that Covered Cause of Loss.
>
> a.   Weather Conditions.  But this exclusion only
> applies if weather conditions contribute in any
> way with a cause or event excluded in
> paragraph 1. above to produce the loss or damage.
>
> b.   Acts or decisions, including the failure to
> act or decide, of any person, group, organization
> or governmental body.
>
> c.   Faulty, inadequate or defective:
>
>> 1) Planning, zoning, development, surveying,
>>    siting;

2) Design, specifications, workmanship,
repair, construction, renovation,
remodeling, grading, compaction;

3) Materials used in repair, construction,
renovation or remodeling; or

4) Maintenance; of part or all of any
property on or off the described premises.

Dkt. No. 28-1, ¶ 24; Dkt. No. 39-1, ¶ 24; see also Policy, p. 51

("Inadequate Workmanship Exclusion"). Additionally, the

Policy's "Limitations" section states as follows:

The following limitations apply to all policy forms
and endorsements, unless otherwise stated.

1. [Defendant] will not pay for loss of or damage to
property, as described and limited in this section.
In addition, [Defendant] will not pay for any loss
that is a consequence of loss or damage as described
and limited in this section.

. . . [.]

c. The interior of any building or structure, or
to personal property in the building or
structure, caused by or resulting from rain,
snow, sleet, ice, sand or dust, whether driven by
wind or not, unless:

1) The building or structure first sustains
damage by a Covered Cause of Loss to its
roof or walls through which the rain, snow,
sleet, ice, sand or dust enters;
[or] . . . [.]

Dkt. No. 28-1, ¶ 24; Dkt. No. 39-1, ¶ 24; see also Policy, p. 52

("Interior Rainwater Limitation").

## IV. Defendant's Inspection and Denial of Coverage

Plaintiff reported the rain incident both to the agent from whom he had purchased the Policy, as well as to Defendant. Dkt. No. 23-2, ¶ 5; Dkt. No. 34, ¶ 5. On September 4, 2013—almost two weeks after the incident took place—William Arnold ("Arnold") of Custard Insurance Adjusters inspected the Property on behalf of Defendant. Dkt. No. 28-1, ¶ 17; Dkt. No 39-1, ¶ 17. According to his testimony via affidavit, Arnold's inspection procedure proceeded as follows:

> 3.
>
> I inspected the building . . . on behalf of [Defendant].
>
> 4.
>
> I also interviewed [Plaintiff] and David Bess regarding the loss.
>
> 5.
>
> I learned that prior to August 22, 2013, Mr. Bess and another roofer were replacing an existing foam roof on [the Property] with a new metal roof. Prior to August 22, 2013, Mr. Bess and another roofer had removed portions of the existing foam roof. Prior to August 22, 2013, the new metal roof had not yet been installed on [the Property].
>
> 6.
>
> Based upon my personal investigation of [the Property] and the interviews of [Plaintiff] and Mr. Bess, I determined that rain water [sic] entered [the Property] through cuts made in the existing foam roof prior to the rain event by Mr. Bess and another roofer.

7.

> Inadequate repairs to the roof at [the Property]
> created openings in the foam roof through which the
> rain water entered the [b]uilding.

8.

> After making my determination, I then prepared a
> report with these findings and submitted it to
> [Defendant].

Dkt. No. 28-8 ("Arnold Aff."), ¶¶ 3-8; see also Dkt. No. 28-1,

¶¶ 18-20; Dkt. No. 39-1, ¶¶ 18-20. In addition to setting forth

these findings, Arnold's report contains his notes and various

photographs of the Property, including the roof. Dkt. No. 42-1

(Arnold's First Report dated September 5, 2013, and Final Report

dated September 13, 2015).

Relying on Arnold's report, Defendant denied coverage for

the rainwater damage to the interior of the building in a letter

to Plaintiff dated December 24, 2013. See Dkt. No. 23-1, ¶ 7;

Dkt. No. 28-1, ¶ 21; Dkt. No. 34, ¶ 7; Dkt. No. 39-1, ¶ 21.

Defendant's letter states, in pertinent part, as follows:

> Our investigation of this loss has revealed that water
> entered into the building due to unsecure roofing work
> that was being performed by David Bess and Joel
> Mendez. Please note that in order for there to be
> coverage to the interior of the building, and
> contents, as a result of rainwater, there must be an
> opening created by a covered peril.
>
> We regretfully deny coverage for this loss as it is
> not covered under your policy and we refer you to the
> following policy provisions:
>
> In your Causes of Loss – Special Form CP1030 06 07

C. Limitations
   The following limitations apply to all policy
   forms and endorsements, unless otherwise stated.
   1. We will not pay for loss of or damage to
   property, as described and limited in this
   section.  In addition, we will not pay for any
   loss that is a consequence of loss or damage as
   described and limited in this section.
       c.   The interior of any building or
            structure, or to personal property in
            the building or structure, caused by or
            resulting from rain, snow, sleet, ice,
            sand or dust enters; or
            1)   The building or structure first
                 sustains damage by a Covered Cause
                 of Loss to its roof or walls
                 through which the rain, snow,
                 sleet, ice, sand or dust enters;
                 or

Dkt. No. 28-7, p. 2; see also Dkt. No. 23-2, ¶¶ 7-8; Dkt. No.

34, ¶¶ 7-8.  Notwithstanding its denial of coverage for the

interior rainwater damage, Defendant eventually paid

approximately $32,000 for the damage to the ceiling of the

Property as a result of this incident.  Dkt. No. 23-1, p. 4;

Dkt. No. 28-2, p. 4.

## V.    Plaintiff's Causes of Action

Plaintiff filed suit against Defendant in the Superior

Court of Glynn County on June 6, 2014, dkt. no. 1-1, pp. 3-7,

and Defendant removed the action to this Court on July 29, 2014,

id. at pp. 18-19.  Plaintiff claims that Defendant has breached

its contractual duties in denying coverage, entitling Plaintiff

to recovery in the amount of $85,000 (the alleged cost for

ServPro to remediate the Property). Id. at pp. 4-6.

Additionally, Plaintiff asserts that the alleged breach amounted

to bad faith, such that Defendant is liable for bad-faith

penalties in the amount of $42,500 and reasonable attorneys'

fees under O.C.G.A. § 33-4-6, as well as attorneys' fees, costs,

and expenses under O.C.G.A. § 13-6-11. Id. at pp. 5-6.

## LEGAL STANDARDS

Summary judgment is required where "the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A fact is "material" if it "might affect the

outcome of the suit under the governing law." FindWhat Inv'r

Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)). A dispute over such a fact is "genuine" if the

"evidence is such that a reasonable jury could return a verdict

for the nonmoving party." Id. In making this determination,

the court is to view all of the evidence in the light most

favorable to the nonmoving party and draw all reasonable

inferences in that party's favor. Johnson v. Booker T.

Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir.

2000).

The party seeking summary judgment bears the initial burden

of demonstrating the absence of a genuine issue of material

fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Howard, 572 F. App'x at 694-95 (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).

## DISCUSSION

Each of the parties now moves for full or partial summary judgment in its favor on Plaintiff's claims, see dkt. nos. 23, 28, and moves to strike certain portions of the record on summary judgment, see dkt. nos. 39, 57. The Court held a hearing on the summary-judgment motions on August 3, 2015, at which time it indicated that it would allow the parties to file supplemental briefing on the issues within the one-week period following the hearing. See Dkt. No. 50. The Court now addresses the several pending motions in turn.[4]

## I.    Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 23)

Plaintiff's Motion seeks a summary ruling that the Policy's Interior Rainwater Limitation, on which Defendant relied to deny coverage in its December 24, 2013, letter, is ambiguous and thus must be construed against Defendant and in favor of providing coverage to Plaintiff. Dkt. No. 23-1, p. 4. Plaintiff emphasizes that Georgia courts construe insurance policies from

---

[4]   Defendant moves to strike a Supplemental Brief that Plaintiff filed on November 9, 2015 (dkt. no. 55), on the basis that it is untimely. Dkt. No. 57. Defendant's Motion to Strike (dkt. no. 57) is **DENIED,** and the Court will consider Plaintiff's Supplemental Brief in evaluating the dispositive Motions now before the Court.

a layman's standpoint; therefore, if a layman would find an insurance policy confusing, it is ambiguous and is construed against insurer and in favor of affording coverage to the insured. Id. at p. 6 (citing Se. Fire Ins. Co. v. Heard, 626 F. Supp. 476, 477 (N.D. Ga. 1985), and York Ins. Co. v. Williams Seafood of Albany, Inc., 544 S.E.2d 156, 156 (Ga. 2001)). Citing two federal cases involving similar language, Plaintiff argues that the exception to the Interior Rainwater Limitation in the Policy is circular and ambiguous from a layman's standpoint, in that it negates the exclusion of interior rainwater damage if the excluded cause results in a "Covered Cause of Loss," while it defines "Covered Causes of Loss," in part, by reference back to the Interior Rainwater Limitation and this exception. Id. at pp. 5-6 (citing Stack Metallurgical Servs., Inc. v. Travelers Indem. Co. of Conn., No. CIV. 05-1315-JE, 2007 WL 464715, at *7 (D. Or. Feb. 7, 2007), and Iroquois on the Beach, Inc. v. Gen. Star Indem. Co., No. 2:06-CV-233, 2007 WL 2984197, at *9 (W.D. Mich. Oct. 12, 2007)). Plaintiff submits that the Court should find the looping language in the Interior Rainwater Limitation to be ambiguous and, construing this provision in Plaintiff's favor, grant summary judgment on his breach of contract claim, such that only his claims for bad faith and attorneys' fees proceed to trial. Id. at pp. 8-9.[5]

---

[5] In his Supplemental Brief, Plaintiff argues that even if the Policy

Urging the Court to deny Plaintiff's Motion, Defendant counters that the Interior Rainwater Limitation is unambiguous, as it plainly provides that this type of damage is not covered, subject to one exception that applies only if two elements are met: (1) "the building first sustains <u>damage</u> to its roof or walls through which the rain enters," and (2) "the damage is caused by a "Covered Cause of Loss." Dkt. No. 35, pp. 6-7, 14-17 (citing <u>Interior Shutters, Inc. v. Valiant Ins. Co.</u>, 242 F.3d 389, 389 (10th Cir. 2000), and <u>Charter Oak Fire Ins. Co. v. Carteret Cty. Bd. of Comm'rs</u>, 91 F.3d 129, 129 (4th Cir. 1996)).[6] Nor is the Inadequate Workmanship Provision ambiguous, according to Defendant, because courts within and outside of Georgia have enforced similar provisions that, by their plain language, preclude coverage for any damage caused by faulty workmanship or repair, except where "the excluded cause[] results in a cause of loss that is not excluded" (in which case, "the exclusion does not apply to damage from the resulting cause of loss"). <u>Id.</u> at

terms are unambiguous, he is entitled to summary judgment because Defendant has waived all limitations and exclusions and, in any event, the Policy provides coverage under these facts. <u>See</u> Dkt. No. 55, p. 9. However, as discussed more fully with regard to Defendant's Motion for Summary Judgment, Plaintiff's waiver argument fails, and his contentions regarding the Policy's coverage demonstrate, at best, that a genuine factual question remains as to this issue. <u>See</u> <u>infra</u> Part III.

[6] Defendant notes that although Plaintiff argues that the Interior Rainwater Limitation contains the allegedly ambiguous exception applying if "the excluded cause results in a 'Covered Cause of Loss,'" this language does not appear in the Interior Rainwater Limitation and, instead, exists only in the Inadequate Workmanship Exclusion. Dkt. No. 35, p. 10 n.2.

pp. 9-14 (citing <u>Nationwide Mut. Ins. Co. v. Kershaw Mfg. Co.</u>, 401 S.E.2d 23, 23 (Ga. Ct. App. 1990)). Defendant purports to illustrate the straightforward nature of this provision by plugging the facts of this case into the language as follows: "[Defendant] will not pay for loss or damage caused by or resulting from [inadequate repairs/workmanship]. But if [inadequate repairs/workmanship] results in a [Covered Cause of Loss], we will pay for the . . . damage caused by the [subsequent] Covered Cause of Loss." <u>Id.</u> at p. 10 (first alteration added).

Georgia courts construe an insurance policy "as a layman would read it." <u>York Ins. Co.</u>, 544 S.E.2d at 157 (citing <u>Nationwide Mut. Fire Ins. Co. v. Collins</u>, 222 S.E.2d 828, 828 (Ga. Ct. App. 1975)). "The court will construe an ambiguous policy, especially the exclusions or limitations, against the insurer." <u>Se. Fire Ins. Co.</u>, 626 F. Supp. at 477 (citing <u>Richards v. Hanover Ins. Co.</u>, 299 S.E.2d 561, 563 (Ga. 1983)). However, when an insurance policy is clear and unambiguous, a court will construe it as written. <u>Id.</u> (citing <u>Richards</u>, 299 S.E.2d at 561).

In the instant case, the Policy language cited by Plaintiff is clear and unambiguous. As Defendant notes, the allegedly ambiguous language does not appear in the Interior Rainwater Limitation—the provision that Defendant contends bars coverage

in this case—but rather is found in the Inadequate Workmanship Exclusion. Dkt. No. 35, p. 10 n.2. However, to the extent that the exception to the Interior Rainwater Limitation requires reference to the "Covered Causes of Loss" definition and, in turn, the Inadequate Workmanship Exclusion, the exclusion's exception clause is not sufficiently ambiguous so as to remove Plaintiff's claim from the exclusion.

Rather, the exception to the Inadequate Workmanship Exclusion appears to be "routine in the industry" and is applied in a situation "where an excluded cause of loss, e.g., an earthquake, may both independently cause damage and result in a fire, an occurrence that is a covered cause of loss. In that situation the direct earthquake damage would not be insured but the ensuing fire damage would be insured." Carney v. Assurance Co. of Am., No. Civ. JFM-04-3434, 2005 WL 899843, at *2 n.4 (D. Md. April 19, 2005) (holding that a faulty workmanship exclusion containing an exception for a "loss by a covered cause of loss," while perhaps redundant, does not create ambiguity) aff'd, 177 F. App'x 282, 283 (4th Cir. 2006) (finding that this provision "unambiguously excludes coverage" for damage caused by faulty workmanship and provides an "exception to this exclusion for losses caused by an intervening 'Covered Cause of Loss'"); see also TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574, 579 (6th Cir. 2010) ("While the faulty workmanship exclusion applies to

loss or damage 'caused by or resulting from' the construction defect, the 'ensuing loss' provision clarifies that the insurance company could not use the exclusion to avoid coverage for losses remotely traceable to an excluded cause."); Church of the Palms-Presbyterian (U.S.A.), Inc. v. Cincinnati Ins. Co., 404 F. Supp. 2d 1339, 1343 (M.D. Fla. 2005) (finding that an exclusion containing this exception is not ambiguous) aff'd, 189 F. App'x 932 (11th Cir. 2006).

The cases cited by Plaintiff do not persuade the Court otherwise. See Dkt. No. 23-1, pp. 5-6. In Iroquois, the court considered whether the inadequate workmanship exclusion provided an independent basis for denying coverage, and, as such, found that the cross-references between the exclusion's exception clause and the definition of "covered cause of loss" were circular. Iroquois on the Beach, Inc., 2007 WL 2984197, at *9. Unlike this case, the cross-references between the exception and the "covered cause of loss" definition were not broken by reference to an interior rainwater limitation or other outside provision that could offer substance to the scope of coverage. See id.

In Stack, the court determined that the exception to the inadequate workmanship exclusion was ambiguous, noting only that the "covered causes of loss" referenced therein were vaguely defined as "risks of direct physical loss." Stack Metallurgical

Servs., Inc., 2007 WL 464715, at *7. Because the court in Stack does not appear to have taken into account that the definition of "covered causes of loss" included not only "risks of direct physical loss" but also the phrase, "unless the loss is: [e]xcluded in [the sections on exclusions and limitations]," see id. at *4, 7, the Court declines to follow the reasoning in that case. Rather, the exclusions and limitations existing outside of the "Covered Causes of Loss" definition and Inadequate Workmanship Exclusion in this case give shape to the language in these provisions and counsel against the result urged by Plaintiff through the cited cases.

Thus, Plaintiff fails to sustain his burden of proving that any language in the Policy is ambiguous. Under these circumstances, the Policy must be enforced according to its plain terms. Plaintiff's Motion for Partial Summary Judgment is, therefore, **DENIED.**

## II. Plaintiff's Motion to Strike (Dkt. No. 39)

Plaintiff moves to strike certain affidavit evidence on which Defendant relies in its Motion for Summary Judgment, discussed infra. Dkt. No. 39. Relying on Federal Rule of Civil Procedure 56(c)(4) ("Rule 56(c)(4)"), Plaintiff argues that paragraphs six through eight of Arnold's affidavit—which discuss the source of the interior rainwater damage—should be excluded because they contain conclusions rather than statements of fact.

AO 72A
(Rev. 8/82)

_Id._ at p. 16.  Additionally, Plaintiff asserts that Arnold

offers expert opinion that is improperly couched as lay

testimony and, in any event, does not meet the requirements to

be admissible as lay testimony.  _Id._ at pp. 17-20.  In

particular, Plaintiff challenges Arnold's affidavit as relying

on "personal investigation" and conversations with Plaintiff and

Bess but failing to "explain what that personal investigation

entailed, why his personal investigation led him to reach his

conclusion, nor what [] Bess or [] Plaintiff allegedly said,

which would be hearsay."  _Id._ at pp. 15-16.

Defendant, in response, maintains that Arnold's statements

concerning his impressions of the Property can only be

characterized as factual observations, not legal conclusions.

Dkt. No. 42, p. 15.  Defendant also states that Arnold's

testimony is admissible because his affidavit, as well as his

complete report containing notes and pictures, "set forth the

basis for his personal knowledge (investigation and interview),

what his personal knowledge is (roof being replaced and trenches

cut in the roof), [and] what he observed (the water entered

through the trenches cut in the roof)."  _Id._ at pp. 15-16.

Defendant argues that Arnold is a lay, fact witness testifying

as to his personal observation, not his opinion, that holes were

present in the roof through which rainwater had entered.  _Id._ at

p. 16.  Nevertheless, Defendant submits that even if Arnold's

testimony could be considered opinion testimony, it satisfies the requirements for nonexpert testimony in the form of an opinion. Id.

Pursuant to Rule 56(c)(4), an affidavit used in briefing a summary-judgment motion must (1) "be made on personal knowledge," (2) "set out facts that would be admissible in evidence," and (3) "show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). To be admissible in evidence, lay-witness testimony in the form of an opinion must also be "rationally based on the witness's perception; . . . helpful to . . . determining a fact in issue; and . . . not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 ("Rule 701"); see also Fed. R. Evid. 702 ("Testimony by Expert Witnesses"). Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).

Contrary to Plaintiff's contentions, Arnold's testimony in paragraphs in six through eight is, for the most part, admissible under Rule 56(c)(4) and Rule 701. To begin, Arnold's statements concerning the source of the leaking rainwater are rationally based on his perception and firsthand knowledge of facts. Arnold explains that he bases these statements on his "personal investigation" and conversations with Plaintiff and

Bess. Arnold Aff., ¶ 6. While Plaintiff finds this explanation insufficient, dkt. no. 39, pp. 15-16, Plaintiff overlooks that Arnold states in his Affidavit that, in addition to interviewing witnesses, his investigation also entailed examining the roof, the repairs, and the building, Arnold Aff., ¶¶ 3-4, and that his report—which was disclosed to Plaintiff during discovery—contains notes and photographs documenting the same, dkt. no. 42-1. Arnold explains that he learned through this investigation that the roof was under repair and that those repairs involved cutting trenches into the existing foam roof. Arnold Aff., ¶¶ 5-6. He further shows that he reached his conclusion that water entered the building due to the repairs, by personally observing where the water entered the trenches in the roof. Id. at ¶¶ 6-7.[7]

Additionally, Arnold's affidavit testimony sets forth the facts, rather than legal conclusions, regarding what he observed on the Property. Arnold can offer the facts and even his lay opinion as to the origin of the leak, because he personally observed the trenches in the roof, his observations will assist in understanding how the water could have permeated the roof,

---

[7] Although Plaintiff emphasizes that Arnold's investigation took place almost two weeks after the flooding occurred, dkt. no. 39, p. 16, this fact is of no consequence. Relevant here is that Arnold's statements relate to his personal observations and perceptions at the time of his investigation. That the investigation occurred sometime after the incident goes to the weight to be accorded to this evidence, not the admissibility thereof.

and he need not have a scientific or specialized background to know that water would have entered through the openings in the roof that he observed.  See Fed. R. Evid. 701.  Finally, this testimony, except as expressly noted below, does not cross into the realm of specialized knowledge or other expert opinion, as Plaintiff implicitly recognizes in citing the deposition testimony of the Roofers, who are not identified as experts in this case, in support of his argument as to the apparent cause of the leak, see dkt. no. 39, p. 18.

However, Arnold's testimony is inadmissible to the extent that he opines that the repairs were "inadequate" in paragraph seven.  See Arnold Aff., ¶ 7.  It appears that the adequacy of workmanship is generally a topic reserved for expert opinion. See, e.g., Berkshire Med. Ctr., Inc. v. U.W. Marx, Inc., 644 F.3d 71, 78 (1st Cir. 2011); Rogers v. Unitrim Auto & Home Ins. Co., 388 F. Supp. 2d 638, 641 (W.D.N.C. 2005).  As Plaintiff states, "Arnold—an employee of an adjusting firm—is attempting to opine whether certain unidentified repairs were 'inadequate' [so as] to 'create[] openings.'"  Dkt. No. 39, p. 18.  While perhaps based on his personal knowledge and arguably helpful to a trier of fact, nothing in the record suggests that Arnold is competent to testify regarding the quality of construction work or the workmanship on the Property in this case.

Accordingly, Arnold's statements in paragraphs six through eight—other than his belief that the workmanship was "inadequate"—are admissible as lay testimony. Thus, Plaintiff's Motion to Strike these statements is **GRANTED in part** and **DENIED in part**. The Court considers the affidavit only to this extent in evaluating Defendant's Motion for Summary Judgment below.

### III. Defendant's Motion for Summary Judgment (Dkt. No. 28)

Defendant's Motion requests full or partial summary judgment as to Plaintiff's claims for relief. Dkt. No. 28-2. Plaintiff has filed a Response opposing this Motion in its entirety. Dkt. No. 39. The Court considers the parties' arguments as to each of Plaintiff's claims separately.

### A. Plaintiff's Breach of Contract Claim

Defendant seeks judgment in its favor on Plaintiff's breach of contract claim, on the basis that the Policy's Interior Rainwater Limitation bars coverage for the exact type of damage that undisputedly occurred here—damage to the interior of the building as a result of rain. Dkt. No. 28-2, pp. 7–8. Defendant contends that the Interior Rainwater Limitation's exception—restoring coverage where a roof first sustains damage by a covered cause of loss—does not apply, because the openings in the roof at that time were caused by repairs and improvements and thus did not come within the dictionary definitions of "damage" as "harm, injury, and degradation" and harm that

"impair[s] its value, usefulness, or normal function." Id. at pp. 9-10 (quoting Oxford Dictionaries (2015), http://www.oxforddictionaries.com). Even if the openings in the roof could be considered damage, Defendant continues, coverage is not available under this exception because the damage was caused by the Roofers' inadequate workmanship or repairs, which is not a "Covered Cause of Loss" by virtue of the Inadequate Workmanship Exclusion. Id. at pp. 10-15 (citing Arnold Aff., ¶¶ 6-7; Bess Dep., 35:4-11; Mendez Dep., 32:9-18; Pl.'s Dep. 94:15) ("The damage here was caused by a roofer that did not properly protect a roof under construction.").

In his Response, Plaintiff argues that Defendant "has waived all limitations or exclusions and is estopped to deny coverage" in this action. Dkt. No. 39, p. 1. Plaintiff first states that Defendant waived all imitations or exclusions from coverage "by paying the interior ceiling-damage loss arising from the same incident under the same policy for the same date of loss" after receiving Arnold's independent report—the report that Defendant cites as its basis for denying the interior-damage claim. Id. at pp. 1-6. Plaintiff's second waiver argument is premised upon Defendant's denial-of-coverage letter dated December 24, 2013, which Plaintiff states waived all defenses to coverage by setting forth a "non-existent policy provision." Id. at p. 6. While Plaintiff recognizes that the

provision cited in Defendant's letter is similar to the Interior Rainwater Limitation but distinct in that it changes or omits some language from the limitation, Plaintiff nevertheless maintains that Defendant is "married to the purported policy provision" and cannot rely upon any other provision in this suit. Id. at pp. 6-8.

In addition to arguing waiver, Plaintiff responds to Defendant's contentions regarding the Interior Rainwater Limitation, focusing on the exception to this limitation as the purported basis for coverage in this case. Id. at pp. 8-9. Plaintiff emphasizes that damage to the roof is a separate inquiry from the cause of that damage, and that the opening in the roof in this case fell within Defendant's definition of "damage" as harm "impair[ing] its value, usefulness, or normal function." Id. (quoting Dkt. No. 28-2, p. 9). As to whether this damage was caused by a covered cause of loss, Plaintiff argues that Defendant has waived any defense based on the Inadequate Workmanship Exclusion by not mentioning it in the letter denying coverage and, in any event, fails to show that the facts here come within this exclusion. Id. at pp. 9-19, 21-24. Specifically, Plaintiff states that Defendant does not establish the precise location in the roof through which the rainwater entered and, even assuming that it entered through holes caused by the repairs of the Roofers, does not show how

these repairs were inadequate. Id. at pp. 12-19 (citing Bess Dep. 26:22-24, 27:19-45, 29:6-7, 31:20-25, 32:1; Mendez Dep. 28:25, 29:1-4, 34:5-10; Pl.'s Dep. 51:20-25, 52:1).[8]

   1. Waiver of Defenses Based on Payment for Other Loss

Under Georgia law, "[a]n insurer may waive any provision in an insurance policy inserted for its benefit, and may waive any condition or limitation in the policy upon which it could otherwise rely." Sargent v. Allstate Ins. Co., 303 S.E.2d 43, 46 (Ga. Ct. App. 1983) (quoting 16B Appleman, Insurance Law and Practice § 9083). For example, "[p]ayment by the insurer with knowledge of the pertinent circumstances giving it a policy defense waives its right to rely thereon." Id. at 46-47 (quoting 16B Appleman, Insurance Law and Practice § 9366).

However, "[t]he doctrine[] of implied waiver . . . [is] not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom." Id. at 45-46 (quoting Ballinger v. C. & S. Bank, 229 S.E.2d 498,

_____

[8] Plaintiff also briefly argues that even if Defendant succeeds in demonstrating that the Inadequate Workmanship Exclusion embraces these facts, coverage is nevertheless mandated under a collapse provision in the Policy. Dkt. No. 39, pp. 20-21 (citing Policy, p. 53). Plaintiff explains that the provision provides coverage for damage "caused by [an] abrupt collapse of a building or any part of a building" due to the use of defective construction materials during the course of construction or renovation. Id. (quoting Policy, p. 53). Plaintiff, however, does not explain how the sagging of the tarps constituted a "collapse," how the tarps could be considered part of the building, or how the tarps were defective in any way. As such, Plaintiff fails to point to any evidence in the record creating a genuine dispute under this provision so as to withstand summary judgment on this basis.

498 (Ga. Ct. App. 1976)). Thus, an insurer may waive a defense based on a condition or limitation—a provision that, for its benefit, requires that the insured fulfill certain procedural prerequisites before obtaining proceeds under the policy—but cannot waive a defense based on an exclusion, which is "designed to limit the risks for which the insurer will provide coverage." Ideal Mut. Ins. Co. v. Lucas, 593 F. Supp. 466, 468-69 (N.D. Ga. 1983) (citing Ballinger, 229 S.E.2d at 498, and Am. Home Mut. Life Ins. Co. v. Harvey, 109 S.E.2d 322, 322 (Ga. Ct. App. 1959)).

Plaintiff fails to show that Defendant, in paying insurance proceeds to cover the loss owing to the ceiling damage, waived all defenses based on any exclusion or limitation on which it could otherwise rely to deny coverage in this action. Plaintiff specifically cites the Interior Rainwater Limitation, which bars coverage of losses resulting from interior rainwater damage, except in certain circumstances. Dkt. No. 39, pp. 1-6. This limitation is not aimed at placing procedural prerequisites on Plaintiff's ability to obtain payment of his benefits; instead, the provision serves to limit the risks for which Defendant will provide coverage. If the Court were to find that Defendant waived any defense based on this limitation, such a decision could result in Defendant paying benefits for interior rainwater damage that is not within the scope of coverage under the Policy

and is not a risk for which Defendant ever assumed liability.

As such, the Interior Rainwater Limitation operates as an

exclusion that cannot be waived under Georgia law, and

Plaintiff's arguments to the contrary must fail. See Ideal Mut.

Ins. Co., 593 F. Supp. at 468 (citing Ballinger, 229 S.E.2d at

498, and Am. Home Mut. Life Ins. Co. v. Harvey, 109 S.E.2d 322,

322 (Ga. Ct. App. 1959)).

    2. Waiver of Defenses Based on the Denial-of-Coverage
       Letter

    Georgia law also provides authority for the proposition

that an insurer waives all defenses to coverage other than those

set forth in its letter denying coverage. Moon v. Cincinnati

Ins. Co., 920 F. Supp. 2d 1301, 1304–06 (N.D. Ga. 2013) (citing

Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 413 (Ga. 2012)). In

those circumstances, a denial letter may be construed as

limiting the grounds upon which an insurer can deny liability in

an action by the insured. Id. at 1306. An insurer's purported

reservation of the right to raise other defenses, expressed in

the denial letter or in a separately communicated at a later

time, does not change this result. Id. at 1304–05 (citing

Hoover, 730 S.E.2d at 413.

    Contrary to Plaintiff's argument that Defendant waived all

defenses under the Policy by citing a "non-existent policy

provision" in the letter denying coverage, dkt. no. p. 6, the

letter, as Defendant notes, includes a largely complete quotation of the Interior Rainwater Limitation, dkt. no. 42, p. 22. The letter tracks the language of the Interior Rainwater Limitation with two exceptions: (1) the letter substitutes the clause at the end of the paragraph describing the limitation, which reads, "whether driven by wind or not, unless," with the phrase "enters; or"; and (2) the letter omits the word "the" from the paragraph containing the exception to the limitation. Compare Policy, p. 52, with Dkt. No. 28-7, p. 2. These differences appear to be minor typographical errors, as the "enters; or" language substituted into the end of the limitation paragraph is the language that, in both the letter and the Policy, appears at the end of the exception paragraph just below it, and the omission of an article is a common mistake. Given that the discrepancies between the provision in the letter and that in the Policy are relatively minor—and that Plaintiff had a copy of the Policy to which he could refer in the event that he found the provision in the letter to be confusing—the Court cannot find that Defendant failed to give notice of the Interior Rainwater Limitation in its denial letter so as to preclude its reliance on this provision in defending against this action.

Nor did Defendant waive its arguments regarding the Inadequate Workmanship Exclusion, because it is the Interior Rainwater Limitation, not this exclusion, that is the basis for

denying coverage for damage owing to rainwater. In any event, the exception to the Interior Rainwater Limitation, in conjunction with the definition of "Covered Causes of Loss," incorporate by reference the other Policy exclusions, including the Inadequate Workmanship Exclusion, such that Plaintiff was put on notice of a possible defense against the application of the exception based on this exclusion. Moreover, because Defendant's denial letter mentions that the rainwater had "entered into the building due to unsecure roofing work," dkt. no. 28-7, p. 2, Plaintiff was fairly apprised of the type of exclusion preventing application of the exception to the Interior Rainwater Limitation. Consequently, Plaintiff's waiver arguments relating to the denial letter likewise fail.

3. Application of the Interior Rainwater Limitation

Georgia courts narrowly construe exclusions and limitations in insurance agreements, "on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." York Ins. Co. v. Williams Seafood of Albany, Inc., 223 F.3d 1253, 1255 (11th Cir. 2000) (quoting Alley v. Great Am. Ins. Co., 287 S.E.2d 613, 616 (Ga. Ct. App. 1981)). Accordingly, an insurer bears the burden of demonstrating that an exclusion set forth in the policy applies to bar coverage for a particular loss. See id. (citing Nationwide Mut. Fire Ins.

<u>Co. v. Rhee</u>, 287 S.E.2d 257, 260 (Ga. Ct. App. 1981)).
Nevertheless, it is the majority view that the burden of proving
an exception to an exclusion lies with the insured. <u>LaFarge</u>
<u>Corp. v. Travelers Indem. Co.</u>, 118 F.3d 1511, 1516 (11th Cir.
1997) (citing <u>Aeroquip Corp. v. Aetna Cas. & Sur. Co.</u>, 26 F.3d
893, 894-95 (9th Cir. 1994)).

Defendant sustains its burden in showing that the Interior
Rainwater Limitation is triggered by the facts here, because
there is no genuine dispute that the interior damage to the
Property was caused by rainwater. Defendant cites the Interior
Rainwater Limitation, which explicitly states that it will not
pay for any damage to the interior of the building resulting
from rain. Dkt. No. 28-2, p. 7 (citing Policy, p. 52).
Additionally, Defendant quotes Plaintiff's deposition testimony
admitting that the damage at issue occurred to the interior of
the building as a result of rain that came in through the roof.
<u>Id.</u> at p. 8 (citing Pl.'s Dep., 94:5-15).

While Plaintiff challenges Defendant's showing regarding
the precise location of the rain's entry, dkt. no. 39, pp. 12-
15, Plaintiff does so in error, because Defendant need not
identify the origin of the rainwater to sustain its burden of
proving that the Interior Rainwater Limitation applies. Rather,
the manner in which the water entered the building is relevant
to the exception to this limitation—as the exception requires

that the roof first sustain damage through which the rainwater enters—and thus is Plaintiff's burden to prove.

It is undisputed that the Roofers cut trenches into the existing foam roof. Dkt. No. 28-1, ¶ 7; Dkt. No. 39-1, ¶ 7. Additionally, Defendant cites the testimonies of Bess and Mendez, who were unable to state with certainty that the water came in through openings caused by the repairs, but nevertheless left open this possibility in testifying that the tarps over the trenches were filled with water and sagging on the date of the incident. Dkt. No. 28-2, pp. 9-10 (citing Bess Dep., 35:4-11; Mendez Dep., 32:9-18). Defendant also cites Arnold's affidavit, which lends more certainty to this inquiry, as Arnold confirms that he observed firsthand that the water entered the building through these openings. Id. at p. 10 (citing Arnold Aff., ¶¶ 6-7). While Plaintiff points out that Arnold did not visit the Property until almost two weeks after the date of loss, dkt. no. 39, p. 16, Plaintiff does not identify any evidence in the record negating Arnold's or the other witness's testimonies, or otherwise suggesting that the rainwater entered the building through a source other than openings caused by the Roofers.

Nevertheless, Plaintiff sufficiently shows that even under Defendant's version of the facts—which, as discussed here, is unrefuted—the roof sustained damage, so as to bring this case within the exception to the Interior Rainwater Limitation. Dkt.

No. 39, p. 9. As Plaintiff persuasively points out, Defendant
errs in blending the damage inquiry with that of the cause of
loss. See id. at p. 8 (exception looks at what happened (i.e.,
did the building "sustain damage?") and how it occurred (i.e.,
was the damage caused "by a Covered Cause of Loss?")).
Regardless of their cause, the openings in the roof were
injuries impairing the normal function of the roof, as
contemplated by Defendant's definitions of "damage." See Dkt.
No. 28-2, p. 9.

Further, Plaintiff demonstrates that there is a genuine
dispute as to whether the damage resulted from a covered cause
of loss. Although Defendant argues that the damage was caused
by the inadequate workmanship of the Roofers, which is an
excluded cause of loss pursuant to the Inadequate Workmanship
Provision, Defendant has no strong evidence to support the
conclusion that the repairs were inadequate—other than Arnold's
statement via affidavit to this effect, on which Defendant
cannot rely for the reasons discussed in Part III. Nor is this
a case where the workmanship was so blatantly faulty that no
reasonable jury could find that it was adequate, such as if the
workers had left gaping holes in the roof and took no measures
to cover them or otherwise prevent against possible damage due
to weather conditions.

Rather, Plaintiff points to facts in the record showing that the Roofers took several precautionary measures in making their repairs, to minimize the risk that the repairs would result in further damage to the Property: Prior to placing wooden planks in the trenches, the Roofers used wet cement in the trenches to seal the nails, so that water would not get in through the nail holes in the event of rain. Dkt. No. 39, p. 24 (citing Bess Dep., 22:3-7; Mendez Dep., 19:1-7). Additionally, on the day that the rain commenced, Bess, as instructed by Plaintiff, purchased $500 worth of large tarps, which ten workers used to cover the roof, securing them to the building with hundreds of nails and screws. Id. at p. 13 (citing Bess Dep., 26:22-24, 27:19-45, 29:6-7; Mendez Dep., 28:25, 29:1-4; Pl.'s Dep. 51:20-25, 52:1). The next morning, the Roofers checked the tarps, finding them to be "okay" and "fine," id. (quoting Bess Dep., 31:20-25, 32:1), and still secured and fasted to the roof, id. at p. 14 (citing Mendez Dep., 34:5-10).

A jury considering this evidence could find that the Roofers properly cut the trenches and used every reasonable measure in covering them with tarps prior to the rainstorm, but that the rainstorm was far more severe than anyone could have anticipated, or than any measure could have protected against. Or, a jury could conclude that the Roofers' performance was simply not what one would expect from a roofing or construction

company in this field, and that if it had been, the leak would have been avoided. Because workmanship must be inadequate to be excluded from coverage under the Inadequate Workmanship Exclusion, and the application of the Inadequate Workmanship Exclusion determines coverage under the exception to the Interior Rainwater Limitation in this case, the Court finds that the adequacy of the Roofers' workmanship and repairs is a genuine issue of material fact to be resolved by the jury. Thus, this portion of Defendant's Motion is **DENIED.**

### B. Plaintiff's Bad-Faith Claims

Defendant asserts that even if the Court finds a jury issue precluding summary judgment on Plaintiff's breach of contract claim, it is nevertheless entitled to summary judgment in its favor on the claims for bad-faith penalties and attorneys' fees. Dkt. No. 28-2, pp. 16–18. Specifically, Defendant maintains that it had a reasonable basis to contest coverage, because it relied on Arnold's conclusion following his inspection that the rain had entered the building through openings caused by the roof repairs, and Plaintiff never provided Defendant with any information to rebut this finding. Id. at p. 16 (citing Arnold Aff., ¶¶ 6–7; Pl.'s Dep., 63:22–64:2). Defendant also states that it acted reasonably in applying the Policy language in a manner consistent with persuasive authority enforcing similar provisions. Id. at p. 15.

Plaintiff counters that bad faith is a question of fact, and that Defendant thus is not entitled to summary judgment on these claims. Dkt. No. 39, p. 25 (quoting First Fin. Ins. Co. v. Am. Sandblasting Co., 477 S.E.2d 390, 392 (Ga. Ct. App. 1996)). Moreover, Plaintiff argues, there is a factual issue as to whether Defendant's quoting a "non-existent policy provision" constituted an "unfair and deceptive act[]" under O.C.G.A. § 33-6-4(b)(2) (applicable when an insurer makes a statement misrepresenting the terms of a policy issued) or an "unfair claims settlement practice" under O.C.G.A. § 33-6-34 (applicable when an insurer knowingly mispresents the policy provisions relating to coverage). Id. Plaintiff states that another factual issue exists as to whether Defendant denied coverage despite having knowledge that federal opinions had held the language of the cited provision ambiguous, and that Georgia courts construe ambiguity against the insurer. Id. at pp. 25-26.

O.C.G.A. § 33-4-6(a) provides that an insurer that refuses a claim in bad faith may be liable to pay penalties and the attorneys' fees of the insured. In an action under Section 33-4-6(a),

> the insured bears the burden of proving that the refusal to pay the claim was made in bad faith. "A defense going far enough to show reasonable and probable cause for making it, would vindicate the good faith of the company as effectually as would a

> complete defense to the action. Penalties for bad
> faith are not authorized where the insurance company
> has any reasonable ground to contest the claim and
> there is a disputed question of fact." <u>Central Nat.
> Ins. Co. of Omaha v. Dixon</u>, 373 S.E.2d 849, 849 (Ga.
> Ct. App. 1988). Where there is a doubtful question of
> law, the insurer is not liable for bad faith
> penalties. <u>Allstate Ins. Co. v. Ammons</u>, 294 S.E.2d
> 610 (Ga. Ct. App. 1982).

<u>Fed. Ins. Co. v. Nat'l Distrib. Co.</u>, 417 S.E.2d 671, 676 (Ga.

Ct. App. 1992). Likewise, "[w]here questions of law as to the

proper construction of an insurance policy provision have not

been decided by the courts of Georgia and are not of easy

solution, then a finding of damages for bad faith and attorney's

fees are not authorized." <u>State Farm Mut. Auto. Ins. Co. v.

Harper</u>, 188 S.E.2d 813, 817 (Ga. Ct. App. 1972) (citing <u>Life

Ins. Co. of Ga. v. Burke</u>, 132 S.E.2d 737, 737 (Ga. 1963), and

<u>Canal Ins. Co. v. Woodard</u>, 173 S.E.2d 727, 727 (Ga. Ct. App.

1970)).

The presence of bad faith, as Plaintiff points out, <u>see</u>

dkt. no. 39, p. 25, is a question for the trier of fact. <u>First

Fin. Ins. Co.</u>, 477 S.E.2d at 392. However, the issue of bad

faith need not be submitted to the jury if "it can be said that

as a matter of law there was a reasonable defense which

vindicates the insurer's good faith." <u>St. Paul Fire & Marine

Ins. Co. v. Snitzer</u>, 358 S.E.2d 925, 927 (Ga. Ct. App. 1987)

(citing <u>Colonial Life & Accident Ins. Co. v. McClain</u>, 253 S.E.2d

745, 745 (Ga. 1979)).

Here, Defendant has shown reasonable cause for refusing to pay Plaintiff's insurance claim, such that there are not sufficient grounds upon which a jury could find that Defendant acted in bad faith. As Defendant explained to Plaintiff in its denial letter, Defendant acted on Arnold's findings, following inspection, that the rainwater had entered the building through openings caused by the "unsecure roofing work" taking place on the Property at that time. See Dkt. No. 28-7, p. 2. Although the Court now finds that Arnold is not sufficiently qualified to determine whether the workmanship of the Roofers was adequate, it was reasonable for Defendant to rely on his opinion or to draw this conclusion itself from his findings that the repairs had caused openings and that the water had leaked through those openings into the interior. See Arnold Aff., ¶¶ 6-7. Moreover, Plaintiff never provided Defendant with any information undermining Arnold's findings at any time during the investigation, filing, and even litigation of this claim.

O.C.G.A. § 13-6-11, by contrast, allows for the recovery of attorneys' fees and expenses where a defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." "Both the liability for and amount of attorney fees pursuant to O.C.G.A. § 13-6-11 are solely for the jury's determination." Sherman v. Dickey, 744 S.E.2d 408, 413 n.22 (2013) (quoting Royal v. Blackwell, 712

AO 72A
(Rev. 8/82)

S.E.2d 815, 815 (Ga. 2011)). Even so, as with penalties and attorneys' fees under O.C.G.A. § 34-4-6(a), a court may grant summary judgment on a claim under O.C.G.A. § 13-6-11 if "it is clear that, as a matter of law, [the defendant] had reasonable grounds to contest the claim, [and thus] there is no genuine issue of material fact as to whether any of the criteria of O.C.G.A. § 13-6-11 . . . are applicable to [the defendant]." City of Marietta v. Holland, 314 S.E.2d 97, 101 (Ga. 1984) (finding that the lower court erred in failing to grant summary judgment in favor of the defendants, because the defendant had a reasonable basis for denying the plaintiff's claim for retirement benefits).

For the same reasons discussed with regard to Plaintiff's claim under O.C.G.A. § 33-4-6(a), Defendant had reasonable grounds to contest Plaintiff's insurance claim. As a result, there is no genuine dispute of material fact under O.C.G.A. § 13-6-11, and Defendant is entitled to summary judgment on this claim.

Accordingly, the portion of Defendant's Motion relating to bad-faith penalties and attorneys' fees is due to be **GRANTED**.

### CONCLUSION

In light of the foregoing, Defendant's Motion to Strike Plaintiff's Supplemental Brief (dkt. no. 57) is **DENIED**. Additionally, Plaintiff's Motion for Partial Summary Judgment

(dkt. no. 23) is **DENIED**, as the Court finds that the Policy provisions at issue are unambiguous, and that a genuine issue of fact remains as to whether the Policy provides coverage for Plaintiff's loss. Plaintiff's Motion to Strike (dkt. no. 39) is **GRANTED in part** and **DENIED in part**, in that Arnold's affidavit testimony that the repairs to the Property were "inadequate" cannot be used as evidence on summary judgment, but his remaining affidavit statements are admissible for this purpose.

Finally, Defendant's Motion for Summary Judgment (dkt. no. 28) is **GRANTED in part** and **DENIED in part** as follows: The Motion is **GRANTED** to the extent that Defendant is entitled to judgment in its favor on Plaintiff's claims for bad-faith penalties and attorneys' fees under O.C.G.A. §§ 13-6-11 and 33-4-6(a). The Clerk of Court is **DIRECTED** to enter the appropriate judgment as to these claims. However, the Motion is **DENIED** as to Plaintiff's breach of contract claim, given the existence of a genuine factual issue as to the Policy's coverage under these facts.

    **SO ORDERED**, this 25TH day of January, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA